UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE HOLOCAUST VICTIM ASSETS
LITIGATION,

**MEMORANDUM & ORDER**

96-CV-04849 (ERK) (JO)
14-CV-00890 (ERK) (JO)

KORMAN, J.:

I have received a request, dated May 20, 2014, on behalf of the American Jewish Joint Distribution Committee ("JDC") for approval of the budget for the vital humanitarian services to be provided in 2014 from funds allocated for the neediest victims of Nazi persecution from the Swiss Banks Settlement Fund to some of the 70,000 destitute elderly Jewish Victims of Nazi persecution living in the former Soviet Union ("FSU"). Some background discussion is necessary to place in context this application and the objection to any allocation for the benefit of these victims.

This application involves an issue that has arisen on more than one occasion with respect to the $1.25 billion settlement of the class action against the largest Swiss banks, Credit Suisse, Union Bank of Switzerland and the Swiss Bank Corporation (the latter two of which merged during the course of litigation). The background of the case and settlement is set out in *In re Holocaust Victim Assets Litig.,* 105 F.Supp.2d. 139 (E.D.N.Y. 2000), and a discussion of some of the post-settlement issues, particularly those related to the issue discussed here, may be found at *In re Holocaust Victim Assets Litig.,* 302 F.Supp.2d 89 (E.D.N.Y. 2004), which was affirmed by the Second Circuit in an opinion by Judge Cabranes that contains a complete discussion of the

1

background and history of the case. *See In re Holocaust Victim Assets Litig.*, 424 F.3d 132 (2d Cir. 2005), *cert. denied*, 126 S. Ct. 2891 (2006); 126 S. Ct. 2901 (2006).

The specific issue here involves a dispute relating to the allocation of part of the proceeds of the settlement. Briefly, one of the classes benefitting from the settlement was comprised of victims of Nazi persecution from whom assets were looted by the Nazis and the plunder of which was aided by Swiss banks and other Swiss entities. Special Master Judah Gribetz recommended initially that $100 million be allocated to this Looted Assets Class and that the money be distributed to its neediest members. *See* Special Master's Proposed Plan of Allocation & Distribution of Settlement Proceeds, Vol. I at 110–42 (Sept. 11, 2000). As Judge Cabranes observed, this reflected "the Special Master's recognition that the settlement fund, while insufficient to repay even a small fraction of what was looted in the Holocaust, presented an opportunity to provide meaningful assistance to the Looted Asset Class members who are in the greatest financial need." *In re Holocaust Victim Assets Litig.*, 424 F.3d 132, 141 (2d Cir. 2005) (internal citations and quotation marks omitted). Thus, the Special Master proposed "an initial allocation of $100 million to *cy pres* programs designed to benefit the neediest elderly survivors of the Holocaust—who perhaps would be less in need today had their assets not been looted and their lives nearly destroyed. Needy Jewish survivors would receive 90% of the $100 million fund, and the remaining 10% would be distributed to needy Roma, Jehovah's Witness, disabled, and homosexual survivors." *Id.* (internal citations and quotation marks omitted).

On September 25, 2002, I adopted a supplemental recommendation of the Special Master that an additional $45 million in "excess" funds be allocated to that class. Finally, on November 17, 2003, I adopted the recommendation of the Special Master that $60 million in "excess" funds be allocated to the Looted Assets Class and be distributed in accordance with the *cy pres* principles that have successfully governed the administration of the initial allocation and

distribution of $100 million to the Looted Assets Class in 2001, and the first supplemental allocation and distribution of $45 million in 2002. This brought the total allocation to the neediest victims to $205 million.

In a letter dated March 22, 2013, Special Master Judah Gribetz and Deputy Special Master Shari Reig advised me that the accountants to the Settlement Fund had concluded that "approximately $54.5 million will remain from the $1.25 billion Settlement Fund, now that all claims processes ha[d] been completed. A total of $1.24 billion ha[d] been allocated to class members, which [could] increase to approximately $1.29 billion with the allocation of these residual funds, so that payments to Holocaust victims and heirs will have exceeded the amount of the settlement." Ltr. from Special Master, 96-cv-4849, ECF No. 4878. As I had previously made clear, my intention was always to distribute residual funds to the neediest Holocaust survivors as members of the Looted Assets Class. *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89 (E.D.N.Y. 2004). Relying on more current empirical evidence similar to that which I relied upon in making the initial and subsequent allocations, *see* Elizabeth Tighe, et al., *Jewish Elderly Nazi Victims: Update* (Jan. 2013), 96-cv-4849, ECF No. 4873, I filed a draft order which proposed that the same formula for determining the asset allocation be applied to the residual funds. Thus, as previously, 90% of the $50 million in residual funds will be allocated to needy Jewish Nazi victims, of which 75% will be allocated to needy victims in the FSU. These funds would be administered on the Court's behalf by the JDC. The other 25% would be administered on the Court's behalf by the Claims Conference, of which 12.5 % would be allocated to needy victims in Israel, and the other 12.5 % to needy victims in the rest of the world. Ten percent (10%) of the $50 million in residual funds would be allocated to programs serving Roma victims of the Nazis, to be administered on the Court's behalf by the IOM.

On April 18, 2013, I granted the request of Holocaust Survivors' Foundation-USA and various named individuals (collectively "HSF-USA") for an extension until May 10, 2013, to object to the draft order. No objection was filed by that date. Consequently, on May 13, 2013, I signed the order submitted by the Special Masters. Order (May 13, 2013), 96-cv-4849, ECF No. 4886. On May 14, 2013 HSF-USA filed a letter opposing the Special Masters' recommendation. Reply in Opp., 96-cv-4849, ECF No. 4887. The opposition was untimely and I decline to consider it. Subsequently, HSF-USA filed a Rule 59 motion for rehearing on June 10, 2013, the last day for filing such a motion. Mot. to Alter Judgment, 96-cv-4849, ECF No. 4893. The motion essentially constituted an attack on the integrity of the JDC and the Claims Conference. HSF-USA also sought a stay of any further distribution.

The parties have since been engaged in an ongoing exchange of memoranda. I address here the objection to the allocation made to the neediest victims of Nazi persecution in the FSU that is being administered by the JDC. The allocation formula, to which I have already alluded, is not an issue on this motion. Instead, the motion is an attack on the honesty and integrity of the JDC. I had chosen the JDC to administer the moneys for the Jewish Nazi victims in the FSU because the JDC was already on the ground providing assistance to elderly Jewish survivors in need, and my choice of the JDC obviated the necessity to create a new and expensive distribution process. As the Special Master explained:

> Tellingly, when the Allies negotiated the 1946 Paris Reparations Agreement provisions for the assistance of so-called "non-repatriable" Nazi victims, the JDC was one of only two non-governmental organizations to which the Allies assigned responsibility for allocating and distributing the "Jewish" portion of these funds—recognizing, as is true for this Settlement Fund, that it is "essentially that the administering agency should not create a large and expensive field organization, but should operate by allocating the funds under its control to public and private organizations which themselves have facilities for operating in the field."

4

> For the past fifty years, the JDC has remained the central agency providing relief to Jewish victims of Nazi persecution in Central and Eastern Europe and the former Soviet Union. Recognizing the growing capabilities of local organizations, the JDC's more recent programs in those nations have been undertaken and implemented upon consultation with local communities with the aid of the Claims Conference. . . . Significantly, virtually all of the recommended programs for the needy are already functioning, and will incur no start-up costs and relatively low administrative expenses, a crucial concern in light of the Special Master's duty to minimize such deductions from the Settlement Fund.

Special Master's Proposed Plan of Allocation & Distribution of Settlement Proceeds, Vol. I at 120–22 (Sept. 11, 2000).

The motion for rehearing is almost entirely devoted to an attack on the Claims Conference, which does *not* administer the distribution of funds to the neediest victims of Nazi persecution in the FSU, although the Claims Conference along with others have provided supplemental funding for the JDC's efforts in the FSU. *See* Ltr. from Alan H. Gill (July 3, 2013) at 3, 96-cv-4849, ECF No. 4897. Indeed, to the extent that the motion refers to the JDC, it does so fleetingly. *See* HSF-USA Mot. for Reh'g at 13 n.6, 96-cv-4849, ECF No. 4893. Nevertheless, it asks that before the JDC is permitted to distribute additional funds for the benefit of Nazi victims in the FSU, I should conduct "a searching investigation and public hearing into their handling of previous allocations." *Id.* at 13. HSF-USA also requests a stay. Presumably, in the interim, these victims would be deprived of the necessities of life.

This effort to halt the distribution of assistance to the victims of Nazi persecution in the FSU is part of a long-standing effort by HSF-USA to deny or diminish the assistance provided to these victims. Indeed, I demonstrate this more fully in the discussion of HSF-USA's standing that follows. I leave the attack on, and request for, similar relief against the Claims Conference

for an opinion that I expect to file shortly.[1] Because of the urgency of the circumstances of the needy Nazi victims in the FSU, particularly those who reside in Ukraine, I address the motion as applied to the JDC without delay.

I deny the motion for rehearing and for a stay for three reasons. First, I find that HSF-USA has no standing to object to the qualifications of the JDC to administer the funds allocated for the benefit those needy victims. Second, the facts upon which the attack on the JDC rest have long been known to HSF-USA and cannot provide the basis for a motion for rehearing. Third and finally, the motion is without merit.

**I. Standing**

"[T]he Supreme Court has identified three constitutional standing requirements. First, the plaintiff must allege that he or she suffered or imminently will suffer an injury. Second, the plaintiff must allege that the injury is fairly traceable to the defendant's conduct. Third, the plaintiff must allege that a favorable federal court decision is likely to redress the injury." Edwin Chemerinsky, *Federal Jurisidiction* (6th Ed. 2012) § 2.3, at 58. HSF-USA cannot satisfy any prong of that test. The beneficiaries of the funds distributed by the JDC are the neediest victims in the FSU, and not HSF-USA or any of its members. Thus, whether the JDC or any other entity administers the allocation in the former FSU is of no consequence to them. More specifically, their application to stay the distribution of funds by the JDC pending a searching investigation and public hearing will give them nothing. Indeed, although I do not deal here with the comparable application for relief with respect to the Claims Conference, granting that application

---

[1] It is enough to say here that no allegations have ever been made that the Claims Conference engaged in impropriety in any way in the distribution of Looted Assets to the neediest victims. Indeed, unlike the JDC, the Claims Conference does not distribute humanitarian services directly to needy survivors at all. Instead, it provides money to organizations that serve these survivors. Those organizations are then audited. Indeed, the Claims Conference has returned to the Settlement Fund moneys that were not spent by some of those organizations. *See* Claims Conference Report on 2008-10 Funding & Proposal for 2012-13 Funding (Dec. 2012), Part I at 6, 11, 14, 15, 18, Part II at 1-3. I adopted the proposal the Claims Conference proposal for the reallocation of these funds in an order dated December 10, 2012. Mem. & Order (Dec. 10, 2012), 96-cv-4849, ECF No. 4862. Because the proposal was inadvertently not docketed, I am docketing a copy at this time.

would actually harm the neediest victims in the United States, the interests of whom HSF-USA claims to represent.

This is not the only reason for denying HSF-USA standing.  HSF-USA has and its members have sought from the very beginning to diminish if not deny the neediest victims in the FSU any allocation from the Settlement Fund.  As I have previously observed, "some of the groups [and individuals] that claim to be members of HSF-USA have made the process no easier by repeatedly suggesting that the survivors living in the FSU (or by the same logic, former FSU survivors who have immigrated to Israel and the United States) are not 'true survivors.'" *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89, 112 (E.D.N.Y. 2004).  I specifically cited Leo Rechter, one of the founding members of HSF–USA and its Secretary, who wrote:

> Most Jews currently residing in the FSU never saw a Nazi uniform. As you know, by the time the Nazis invaded Russia, they used "Einsatzgruppen" to kill most of the unfortunate Jews they captured. In the communist FSU, most of those that fled eastward were able to take their most precious belongings along and did not own the real-estate they left behind.  The destitute elderly Jews in the FSU are victims of the ravages of WWII (like many non-Jews in the civilian population) and of the failed communist economic system and they ought to get as much charitable assistance as possible.  But by no stretch of the imagination can they be considered to be legitimate members of the "Looted Assets" Class or any other Class.[2]

*Id.* (quoting Ltr. From Leo Rechter to Professor Neuborne (July 22, 2002)).

Similarly, in a letter dated May 13, 2013, which was joined by the members of the HSF executive committee, its President wrote "[w]e opposed and fought with all our might against the diversion of 75% of the class actions settlement funds – funds obtained in the names of and from

---

[2] I have met Leo Rechter during the course of my administration of the settlement, and I have a great deal of affection for him.  Nevertheless, it is difficult for me to let this statement pass without observing that it is simply untrue, as I demonstrated in my initial opinion.  *See In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89, 112 (E.D.N.Y. 2004).

7

the losses of all Holocaust victims – to one portion of the class in the FSU." HSF-USA Reply in Opp'n to Special Masters' Submission, Ex. 1, 96-cv-4849, ECF No. 4887-1.

This is not all. After the Second Circuit affirmed my order allocating the funds to the neediest victims in the manner described above, HSF-USA petitioned for a writ of certiorari. In that petition, they argued that:

> To be perfectly clear, it is and has been Petitioner's position that distribution of funds based on current need, unrelated to the claims being resolved, is unlawful. Period. Petitioners do not endorse current need as a distribution criterion, whether applied across or within national boundaries. They proposed various solutions such as having state insurance commissioners use settlement proceeds to fund an insurance policy that would be available to *all* survivors, nor just the needy. Petitioners' position was and remains that the funds belong equally to all Looted Assets Class members.

HSF-USA Reply in Support of Pet. for Writ of Cert. (May 31, 2006), at 5-6.

This brief indicates the extent to which HSF-USA was willing to go to prevent the neediest victims of Nazi persecution in the FSU from receiving any funding for their desperate needs for the necessities of life. Indeed, if HSF-USA had succeeded, they would have deprived even the needy survivors in the United States, whom they claim to represent, from receiving any assistance based on their need.[3] Moreover, a letter to the New York Law Journal signed by all but one of the movants for rehearing, endorsed the position taken by HSF-USA in the Supreme Court, and again attacked the allocation to the neediest victims in the former Soviet Union. Ltr.

---

[3] I pass over for now the ethical problems with the position that HSF-USA took in the Supreme Court. The representation they made to the Court regarding their position that they had previously taken "that distributions of funds based on current need, unrelated to claims being resolved, is unlawful," HSF-USA Reply in Support of Pet for Writ of Cert. (May 31, 2006), at 5-6, is contrary to the record. *In re Holocaust Victims Assets Litig.*, 424 F.3d 132, 146 (2d Cir. 2005) (HSF-USA "ask[s] us to review only the *manner* in which the *cy pres* distribution of funds to the neediest Looted Assets Class members was accomplished by the District Court—namely, they ask us to consider whether the District Court properly allocated the funds earmarked for needy Jewish Holocaust survivors by directing 75% of those funds to the FSU and only 4% to the United States."). Moreover, this position was a breach of their obligation to the needy victims in the United States whom they claim to represent. Indeed, their argument as to standing was based on one individual appellant—"G.K."—"a needy Holocaust survivor residing in the United States." *Id.* at 146 n.13. Recognizing that their position in the Supreme Court was contrary to her interest, HSF-USA dropped her as petitioner in their petition for certiorari. She is now again part of the case, as one of the parties moving for rehearing and a stay.

8

From Israel Arbeiter et al., N.Y. Law Journal (Sept. 19, 2006) ("[t]he result [of the allocation] was offensive for all but especially tragic for the thousands of U.S. survivors"); *see also* Edward Labaton & Samuel J. Dubbin, Perspective, N.Y. Law Journal (Sept. 19, 2006) (echoing movants' New York Law Journal letter of the same date).

In sum, even if the law on standing were not as clear as applied to the facts of this case, it is inconceivable that the adverse position that HSF-USA has taken with respect to the neediest victims in the FSU should accord them standing to continue to obstruct and delay the distribution of the necessities of life. This is particularly true at this point as the JDC observes in the letter accompanying its request for an allocation of funds for 2014.

Moreover, even if HSF-USA had standing, it would not be entitled to the stay that it seeks. A stay is an equitable remedy that is available to avoid irreparable injury. The denial of a stay application here will not cause any injury to HSF-USA. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). And, as I have indicated, granting such relief with respect to the distribution of funds by the Claims Conference will harm the interests of those whom it claims to represent.

## II. Rule 59 Motion: The Attack on the Integrity of the JDC

I begin with the hornbook law that a "Rule 59(e) motion may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment." Wright, Miller & Kane § 2810.1 (2012). Accordingly, as I have repeatedly held, the remedy that such a motion seeks is an extraordinary one to be employed sparingly in the interest of finality and conservation of scarce judicial resources. *See Boniel v. U.S. Bank, N.A.*, No. 1:12-CV-3809, 2013 WL 1687709, at *1 (E.D.N.Y. Apr. 18, 2013) (quoting *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012); *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)); *United Cent. Bank v. Team Gowanus, LLC*, No. 10-CV-3850, 2013 WL 752196, at *1 (E.D.N.Y. Feb. 27, 2013). The HSF-USA attack on the integrity

9

of the JDC as the administrator of the funds goes back well over a decade. Thus, in an October 3, 2003 email cited in Professor Neuborne's letter dated October 29, 2003, Samuel Dubbin, the attorney for HSF-USA, wrote that:

> the JDC is using Swiss settlement funds to replace prior funding that was being used for the benefit of the elderly and Nazi victims in the Former Soviet Union. This is evident from the comparison of the JDC's 2001 and 2002 Annual Reports . . . . That comparison shows that virtually every relevant category of welfare funding or actual service delivery for the elderly in the FSU went DOWN between 2001 and 2002, despite the infusion of at least $7.5 million from the Swiss Looted Assets funds or $10.8 million between June 28, 2001 and Dec. 31, 2002).

Letter from Steven Schwager to Professor Neuborne (Oct. 29, 2003). In rejecting this attack along with two other challenges to the plan of allocation made by HSF-USA, I observed that one of the challenges to the plan of distribution was "my continued use of the American Jewish Joint Distribution Committee, Inc., for distribution of settlement funds." *Id.* I summarily rejected this argument and I adopted the response that Professor Neuborne, the Lead Settlement Counsel, had made to it. *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89, 92 (E.D.N.Y. 2004) (citing Supp. Neuborne Decl. ¶ 22; Letter from Steven Schwager to Professor Neuborne (Oct. 29, 2003)). HSF-USA did not challenge this holding on its appeal.

Moreover, the most recent attacks on the integrity in the motion for rehearing of the JDC specifically acknowledge that HSF-USA has previously raised the same issue. *See* HSF-USA Letter (May 14, 2013) at 2-3, 96-cv-4849, ECF No. 4887-1; *see also* HSF-USA Mot. for Reh'g at 3, ECF No. 4893 ("The U.S. Survivors' letter to Court dated May 13, 2013 contains more detail about the past issues regarding the lack of transparency and accountability and questionable practices of the Claims Conference and JDC, which the U.S. Survivors had also raised with this Court *long before* the $57 million fraud became public in 2010."). The alleged questionable practices in the Claims Conference do not involve the JDC. Moreover, HSF-USA

10

fails to cite any facts which was not known to it, or which was not part of the record in this case, with which it was not intimately familiar.

**III.    Merits**

The JDC has responded on the merits to the baseless allegations that have been made against it. I summarily reject those arguments for the reasons stated in the memorandum filed by the JDC, just as I summarily rejected the comparable arguments based on Professor Neuborne's response over a decade ago. *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89, 92 (E.D.N.Y. 2004) (citing Supp. Neuborne Decl. ¶ 22; Letter from Steven Schwager to Professor Neuborne (Oct. 29, 2003)).

I prefer to end here by quoting several paragraphs from the preamble of a United States Senate resolution that was passed last December on the occasion of the 100th anniversary of the JDC.

1. "[T]the American Jewish Joint Distribution Committee (referred to in this preamble as the ''JDC''), the leading Jewish humanitarian assistance organization in the world, provides economic relief to communities facing hardship and builds the foundation for self-sustaining Jewish community life[.]"

2. "[W]hen the JDC was founded in 1914, the organization initiated relief projects in communities primarily in Eastern Europe and the Middle East, and, as of November 2013, the JDC works in 70 countries worldwide and touches more than 1,000,000 lives each year[.]"

3. [T]he JDC received the Israel Prize in 2007 for its lifetime achievements and special contributions to society and the State of Israel for developing innovative, scalable solutions to meet the needs of the most disadvantaged citizens in the State of Israel[.]"

4. "[T]he JDC and the United States Government have a historic and enduring relationship that has evolved from cooperating in life-saving work in Europe through the American Relief Administration following World War I and the War Refugee Board during World War II to the more recent partnerships between the JDC and the Department of Agriculture, the Department of State, and the United States Agency for International Development[.]"

5. [T]he JDC creates programs and solutions that benefit the neediest populations in communities around the world and confronts the most difficult challenges, such as natural disasters, extreme poverty, political instability, and genocide[.]"

S. Res. 299, 113th Cong. (2013).

## CONCLUSION

The motion for rehearing and for a stay is denied.

**SO ORDERED.**

Brooklyn, New York
May 23, 2014

/s/
Edward R. Korman
Senior United States District Judge