| UNITED STATES DISTRICT COURT<br>EASTERN DISTRICT OF NEW YORK | **NOT FOR PUBLICATION** |
|---|---|
| IN RE HOLOCAUST VICTIM ASSETS<br>LITIGATION,<br>--------------------------------------------------------<br>This Document Relates to: All Cases | **MEMORANDUM & ORDER**<br><br>14-CV-00890 (ERK) (JO)<br>96-CV-04849 (ERK) (JO) |

KORMAN, J.:

I filed an opinion on May 23, 2014 in which I denied an application by the Holocaust Survivors' Foundation-USA and various named individuals (collectively "HSF-USA") to conduct "a searching investigation and public hearing" into the handling of previous allocations by the American Jewish Joint Distribution Committee ("JDC"). *In re Holocaust Victim Assets Litig.*, Nos. 96-cv-4849 (ERK) (JO), 14-cv-890 (ERK) (JO), 2014 WL 2171144 (E.D.N.Y. May 23, 2014). I also denied their motion for a stay pending an investigation while the neediest victims of Nazi persecution in the Former Soviet Union ("FSU") would go without the necessities of life. *Id.* I address here the motion of Severyn Ashkenazy to intervene in this case, which was filed on July 25, 2013. Mot. to Intervene, 96-cv-4849, ECF No. 4907. Mr. Ashkenazy asserts various grievances with the manner in which the JDC was distributing money in Poland. Ashkenazy Decl. ¶ 17, 96-cv-4849, ECF No. 4917 ("The JDC had done little or nothing to support the Progressive, non-Orthodox, movement in Poland.").

I assume familiarity with the background of this case, which is set out in *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d. 139 (E.D.N.Y. 2000), and *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89 (E.D.N.Y. 2004), which was affirmed by the Second Circuit in an

1

opinion by Judge Cabranes that contains a complete discussion of the history of the case. *See In re Holocaust Victim Assets Litig.*, 424 F.3d 132 (2d Cir. 2005), *cert. denied*, 547 U.S. 1206 (2006).

Briefly, this action was filed in 1996, 18 years ago. The case settled in 1998, and in 2000, 14 years ago, I approved the settlement, *In re Holocaust Victim Assets Litig.,* 105 F. Supp. 2d 139 (E.D.N.Y. 2000), and adopted the Special Master's proposed plan of allocation, *In re Holocaust Victim Assets Litig.*, No. 96-CV-4849 (ERK) (MDG), 2000 WL 33241660 (E.D.N.Y. Nov. 22, 2000), *aff'd*, 2001 WL 868507 (2d Cir. July 26, 2001) (reissued as published opinion, 413 F.3d 183 (2d Cir. 2005)). Subsequently, ten years ago, in 2004, I reaffirmed the principles of the plan of allocation, which to the extent relevant here, allocated funds to the neediest victims of Nazi persecution. *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89 (E.D.N.Y. 2004), *aff'd*, 424 F.3d 132 (2d Cir. 2005). The allocation was supplemented on several occasions to provide the beneficiaries with additional funds. More recently, in a letter dated March 22, 2013, Special Master Judah Gribetz and Deputy Special Master Shari Reig advised me that the accountants to the Settlement Fund had concluded that "approximately $54.5 million will remain from the $1.25 billion Settlement Fund, now that all claims processes ha[d] been completed. A total of $1.24 billion ha[d] been allocated to class members, which [could] increase to approximately $1.29 billion with the allocation of these residual funds, so that payments to Holocaust victims and heirs will have exceeded the amount of the settlement." Letter from Special Master, 96-cv-4849, ECF No. 4878. As I had previously made clear, my intention was always to distribute residual funds to the neediest Holocaust survivors as members of the Looted Assets Class. *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89 (E.D.N.Y. 2004).

Relying on more current empirical evidence similar to that which I relied upon in making the initial and subsequent allocations, *see* Elizabeth Tighe, et al., *Jewish Elderly Nazi Victims:*

2

*Update* (Jan. 2013), 96-cv-4849, ECF No. 4873, I filed a draft order which proposed that the same formula for determining the asset allocation be applied to the residual funds. Thus, as previously, 90% of the $50 million in residual funds would be allocated to needy Jewish Nazi victims, of which 75% would be allocated to needy victims in the FSU. These funds would continue to be administered on the Court's behalf by the JDC. The other 25% would continue to be administered on the Court's behalf by the Claims Conference, of which 12.5 % would be allocated to needy victims in Israel, and the other 12.5 % to needy victims in the rest of the world. Ten percent (10%) of the $50 million in residual funds would be allocated to programs serving Roma victims of the Nazis, and continue to be administered on the Court's behalf by the IOM.

On May 13, 2013, I signed an order submitted by the Special Masters that adopted their recommendation. *In re Holocaust Victim Assets Litig.*, Nos. 96-cv-4849 (ERK) (MDG), 96-CV-5161, 97-CV-461, 2013 WL 2152667 (E.D.N.Y. May 13, 2013). This order should have been the final order in this case. Nevertheless on June 10, 2013, the last day for it to do so, HSF-USA filed a motion for rehearing, Mot. to Alter J., 96-cv-4849, ECF No. 4893, which I have described above and which I denied in part on May 23, 2014, to the extent that it objected to the continued administration of funds to the neediest victims of Nazi persecution in the FSU by the JDC. *See In re Holocaust Victim Assets Litig.*, Nos. 96-cv-4849 (ERK) (JO), 14-cv-890 (ERK) (JO), 2014 WL 2171144 (E.D.N.Y. May 23, 2014). On July 25, 2013, after the motion for rehearing was filed, Mr. Ashkenazy moved to intervene. Mot. to Intervene, 96-cv-4849, ECF No. 4907. Mr. Ashkenazy's principal beef is that the JDC has not provided Beit Warszawa, a so called "registered Jewish Progressive community in Poland," which "seeks a portion of the settlement fund," with sufficient funds. Havkins Certification ¶ 3, 96-cv-4849, ECF No. 4907-1. Because Mr. Ashkenazy has not filed an appropriate pleading, namely a complaint, his request for relief

3

has morphed over time. Indeed, in a declaration filed on January 27, 2014, seven months after his motion to intervene, he asks for a forensic audit of the way the JDC and the Claims Conference have distributed and accounted for looted assets settlement funds. Ashkenazy Decl. ¶ 7, 96-cv-4849, ECF No. 4937.

I deny the motion for three principal reasons. The action is untimely, Mr. Ashkenazy is without standing, and he has failed to file a proper pleading, namely a complaint.

I. Standing

The gist of the motion is that Mr. Ashkenazy has an interest in this litigation by virtue of being a "member of the plaintiff class." Havkins Certification ¶ 17, 96-cv-4849, ECF No. 4907-1. Moreover, because JDC allegedly has "spurned" Ashkenazy and Beit Warszawa on "numerous occasions" their interests "will not be reasonably protected if the JDC is left in charge of the disbursal of the remaining settlement funds." Havkins Certification ¶ 14, 96-cv-4849, ECF No. 4907-1. Mr. Ashkenazy lacks standing to obtain the relief that he seeks because he cannot show that he has an interest in the litigation as it exists today. *See United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 72 ("Particular focus must be had on the posture of that litigation at the same time the motion to intervene is made.").

The principal case against the Swiss Banks, as I have observed, was settled in 1998. *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d. 139 (E.D.N.Y. 2000). Pursuant to the Special Master's Plan of Allocation, which I adopted in *In re Holocaust Victim Assets Litig.*, No. 96-CV-4849 (ERK) (MDG), 2000 WL 33241660 (E.D.N.Y. Nov. 22, 2000), *aff'd*, 2001 WL 868507 (2d Cir. July 26, 2001) (reissued as published opinion, 413 F.3d 183 (2d Cir. 2005)), and reaffirmed in *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89 (E.D.N.Y. 2004), *aff'd*, 424 F.3d 132 (2d Cir. 2005), *cert. denied*, 547 U.S. 1206 (2006), and my order of May 13, 2013, *In re Holocaust Victim Assets Litig.*, No. 96-cv-4849, 2013 WL 2152667 (E.D.N.Y. May 13, 2013),

the only remaining funds are to be distributed to "the neediest Holocaust survivors as members of the Looted Assets Class." Mr. Ashkenazy does not allege that he is a needy survivor or that he resides in the FSU. Indeed, the record suggests that he is an extraordinarily wealthy survivor who resides in Los Angeles, California. Nor does Mr. Ashkenazy allege that Beit Warszawa, an organization which operates in Poland, is even composed of Holocaust survivors, much less needy victims of Nazi persecution who reside in the FSU.[1] Under these circumstances, neither has standing. *See In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 195-96 (2d Cir. 2000). Indeed, Beit Warszawa has not even moved to intervene.

## II. Timeliness

Under Rule 24 of the Federal Rules of Civil Procedure, a prospective intervenor must be permitted to intervene as of right if the applicant claims an interest relating to the subject matter of the case, the disposition of the case stands to impair that interest, and the applicant's interest is not adequately represented by the existing parties. Fed. R. Civ. P. 24(a). Alternatively, an applicant may be permitted to intervene if his or her claim shares a question of law or fact in common with the underlying action and permitting the intervention will not unduly delay or prejudice the rights of the original parties. Fed. R. Civ. P. 24(b). Under either test, however, the motion to intervene must be "timely." Fed. R. Civ. P. 24(a), (b). "Failure to satisfy *any one* of these requirements is a sufficient ground to deny the application. Thus an untimely motion to intervene must be denied." *Farmland Dairies v. Comm'r of New York State Dep't of Agric. & Mkts.*, 847 F.2d 1038, 1043 (2d Cir.1988) (internal citations omitted).

---

[1] The Second Circuit has held that an intervenor need not establish standing if it seeks to intervene in a case in which another party has standing. *United States Postal Serv. v. Brennan*, 579 F.2d 188, 190 (2d Cir. 1978). I have already demonstrated that the only party—if it can be so characterized—who challenges the administration of the allocation to the neediest victims in the FSU, HSF-USA, is without standing to do so. Consequently, it is incumbent upon Mr. Ashkenazy to establish his standing to do so. Indeed, the Supreme Court has held that "an intervenor's right to continue a suit *in the absence of the party on whose side intervention was permitted* is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III." *Diamond v. Charles*, 476 U.S. 54, 68 (1986) (emphasis added).

5

Mr. Ashkenazy was not involved in the case at the outset or at the time the settlement of the case was approved. He did not seek to intervene when the plan of allocation was adopted, nor when I entered orders on September 25, 2002 and November 17, 2003 allocating additional funds, nor when I entered my order of May 13, 2013 allocating the residual funds remaining in accordance with the plan I had originally adopted. Indeed, he was still not involved in the case at the time HSF-USA's motion for rehearing was filed. By the time Ashkenazy moved to intervene, the time for reconsideration of my May 2013 order had already run.

Mr. Ashkenazy's motion to intervene is untimely. While he claims that he first learned of this litigation in June 2013, he certainly should have known about it many years ago—when notice of the settlement was disseminated to class members worldwide. As I observed in approving the settlement:

> The notice plan, which I approved in an order dated May 10, 1999, was tailored to the unique circumstances of this case; was effective as implemented, as discussed below, in that it provided the best notice practicable under the circumstances in terms of content, format and dissemination; and satisfied due process requirements and Fed. R. Civ. P. 23(c). There is no list of all the members of the settlement classes that would have permitted the notice administrators to send notice exclusively by direct mail to all settlement class members. Instead, I directed settlement class counsel, through four notice administrators, to implement the multi-faceted notice plan, involving, in addition to direct mail utilizing existing lists covering segments of the settlement classes, worldwide publication, public relations (*i.e.*, "earned media"), Internet and grass roots community outreach.
> 
> Each of the court-appointed notice administrators oversaw distinct aspects of the notice plan, and their various reports filed with the court detail the exhaustive efforts undertaken to give all settlement class members an opportunity to learn of their rights, evaluate the basic terms of the proposed settlement and comment, either by submitting correspondence, e-mailing the notice administrators or returning an Initial Questionnaire.
> 
> *Each element of the notice plan that I approved has been successfully implemented, including the following: (i) world-wide publication, (ii) press coverage, (iii) an extensive community outreach program, (iv) a direct mail program that included the sending of more than 1.4 million notice packages directly to*

> *potential class members in at least 48 countries and (v) an Internet notice effort.*

*In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 144-45 (E.D.N.Y. 2000) (emphasis added).

The results of my notice plan are summarized as follows in a report of the Notice Plan Administrator:

> a) The worldwide notice campaign undertaken in this case has been the most comprehensive, effective and successful in the history of class action litigation.
>
> b) The combined net effect of the notice activities was that extraordinarily large numbers of all potential Class member groups were notified, based on a scientific examination.
>
> c) At least 90.1% of all Jewish adults in the world were effectively notified by the sum of notice activities undertaken. No class action notice program has so productively integrated notice by Paid Media, Earned Media, Direct Mail and Internet activities, with voluntary cooperation from Third-Party ("Organizational") Outreach that achieved such tangible and demonstrable proof of success. No group or category of Settlement Class members was excluded from notice.
>
> d) No prior class action notice program of which I am aware has so completely covered intended audiences that were as geographically dispersed and as demographically diverse as the classes in this case.
>
> e) As a result, on the basis of cost per person effectively reached, the notice program has been the most efficient and cost effective worldwide communications program of any type that I am familiar with.

Report of Notice Administrator Todd B. Hilsee ¶ 3, 96-cv-4849, ECF No. 355. The foregoing is a summary of a 222-page detailed report, and it is one of three such reports that were filed. The other two were the Report of the Notice Administrator on Organization Outreach, 96-cv-4849, ECF No. 354, and the Report of the Notice Administrator regarding the implementation and

preliminary results of the notice program, 96-cv-4849, ECF No. 356.[2]  I do not burden this opinion with comparable descriptions of the extraordinary notice effort that was made in this case.  Indeed, even one of the unsuccessful objectors acknowledged that "[t]he notification process in this case was hailed as the most ambitious effort ever to notify beneficiaries of a legal settlement."  *In re Holocaust Victim Assets Litig.*, 314 F. Supp. 2d 155, 158 (E.D.N.Y. 2004) (quotation marks omitted).

Moreover, the notice plan aside, when the case was settled in 1998, and in subsequent years until the present, it has received extraordinary media coverage, and the Special Masters have created a website—www.swissbankclaims.com—containing all relevant information regarding the case.  Mr. Ashkenazy himself acknowledges that he first learned about it by reading an article in the Jerusalem Post dated June 13, 2013.  Havkins Certification ¶ 11, 96-cv-4849, ECF No. 4917 (citing Sam Sokol, *Holocaust Survivors Dispute Claims Conference*, http://www.jpost.com/Jewish-World/Jewish-News/Holocaust-survivors-Investigate-Claims-Conference-316350).  Indeed, Mr. Ashkenazy apparently reads the *Reform Judaism* magazine and he attaches as Exhibit 9 to his Declaration dated April 17, 2014, copies of two separate articles from that publication, one of which—the 2009 article—"mentions [his] personal involvement."  Ashkenazy Decl. ¶ 7, 14-cv-890, ECF No. 49.  In 2008, there was a six page article beginning on the front page of *Reform Judaism* on the Swiss Banks case.  *Unfinished Justice:  A Conversation with Michael Bayzler*, Reform Judaism (Spring 2008), http://reformjudaismmag.org/Articles/index.cfm?id=1316.

---

[2] These documents were docketed before entries on the docket sheet for this case were electronically accessible.  I have directed the Clerk of the Court to scan these documents so that they are readily available to the parties.

In his declaration disclaiming knowledge of the existence of this case prior to June 2013, Mr. Ashkenazy provides the following explanation for his lack of knowledge until he read about it in the Jerusalem Post:

> Although I am 77 years old, I am extremely busy and am fully engaged in projects in the United States, Europe, and the middle east. I do not follow court proceedings in the Eastern District of New York (or elsewhere) and was not notified of this action. I am not a lawyer and do my best to avoid litigation, except where, as here, it is absolutely necessary.

Ashkenazy Decl. ¶ 2. Mr. Ashkenazy, however, is a highly educated and sophisticated person, and, as his interest in Beit Warszawa indicates, he is active in Jewish philanthropy and Jewish affairs. Moreover, "Mr Ashkenazy was involved in a leadership role in America ORT in the Los Angeles branch, for which he was honored by the Region leadership Man of the Year. He was instrumental in helping establish the Los Angeles ORT College." Havkins Letter (April 29, 2014) at 2, 14-cv-890, ECF No. 50. "ORT America is a Jewish organization committed to strengthening communities throughout the world by educating people against all odds and obstacles." *See* ORT America: About Us, http://www.ortamerica.org/site/PageServer?pagename=about (May 28, 2014). Mr. Ashkenazy also "advanced to the PhD candidacy in literature" at the University of California, Los Angeles ("UCLA"), and "was asked and has agreed to deliver the commencement address to the UCLA Division of Humanities at the 2014 graduation ceremony." Havkins Letter (April 17, 2014), 14-cv-890, ECF No. 48.

Mr. Ashkenazy does not deny that he reads newspapers and otherwise keeps up with current affairs in the world. Indeed, it is inconceivable that a successful businessman, which Mr. Ashkenazy claims to be, who is engaged in projects throughout the world would not keep abreast with events that go on in the world, particularly those involving Jewish affairs, in which he has taken an obvious interest. If the only newspaper he read were the Jerusalem Post, from which he

9

claims to have first heard about the case 17 years after it commenced, he would have come across dozens of articles, in its print and online editions, describing various aspects of the case.[3]

In sum, I do not credit Mr. Ashkenazy's assertion that he did not know about the case. Moreover, the issue is not whether he had actual knowledge, but whether he "knew or should have known." *Catanzano v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996). Mr. Ashkenazy should have known about this case and the issues related to it. Indeed, the basis for attributing constructive knowledge to Mr. Ashkenazy substantially exceeds information in the media that has been found sufficient in other cases. *See, e.g.*, *NAACP v. State of New York*, 413 U.S. 345, 366–67 (affirming denial of intervention as untimely where lower court "could reasonably have concluded that [putative intervenors] knew or should have known of the [litigation] because," among other things, "of an informative February article in the New York Times discussing the controversial aspect of the suit" published two months before motion to intervene was filed); *United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 595 (2d Cir. 1986) (putative intervenors "had reason to become aware [of issue on which they sought to intervene] would be considered by the court" because "comments were submitted to the district court and became page one news in the Yonkers local newspaper"); *Tummino v. Hamburg,* 260 F.R.D. 27, 30, 36 (E.D.N.Y. 2009) (putative intervenor had notice where the litigation "has been the subject of considerable discussion and national media coverage"); *In re Bank of New York Derivative Litig. (Kaliski v. Bacot)*, 173 F. Supp. 2d 193, 201 (S.D.N.Y.2001) (denying motion to intervene as untimely where the "lawsuit has been pending for more than two years, and has garnered no small amount of media attention. Hence, [the applicant] has had notice of this action for some time."), *aff'd*

---

[3] The Jerusalem Post is erroneously referred to as the "Jewish Post" in the certification submitted in support of the motion. Havkins Certification ¶ 11.

*sub nom.*, *In re Bank of New York Derivative Litig.*, 320 F.3d at 297, 300–01 (quoting district court).[4]

More significantly, Mr. Ashkenazy seeks to intervene after the judgment was entered. Such "[i]ntervention after judgment is unusual and not often granted." *Crown Fin. Corp. v. Winthrop Lawrence Corp.*, 531 F.2d 76, 77 (2d Cir.1976) (quoting 3B Moore, Federal Practice ¶ 24.13(1), at 24–526). Permitting intervention at this point would force those parties (the JDC and Claims Conference) who are directly interested in the subject of the litigation and who do not object to the final judgment to engage in yet another round of time consuming litigation that is costly to the judicial process, if not the parties.[5] Indeed, if what Mr. Ashkenazy seeks is a portion of the Settlement Fund to be allocated to Beit Warszawa, it would require an alteration of the plan of allocation for the Looted Assets Class, the beneficiaries of which are the neediest victims of Nazi persecution in the FSU and elsewhere. Moreover, considering an allocation to Beit Warszawa would involve relitigating a dispute about whether settlement funds should be used for religious or other purposes that do not directly benefit survivors. I resolved that issue a long time ago, and reopening it at this point would serve no purpose. *See In re Holocaust Victim Assets Litig.*, 424 F.3d 158, 169 (2d Cir. 2005) ("We now hold that the District Court acted within its discretion by rejecting [appellant's] proposal and concluding that the neediest among the identifiable survivors—be they Jewish, homosexual, Jehovah's Witnesses, disabled or Romani—must first be brought some comfort in the final years of their lives."). As the Second

---

[4] I am grateful to Judge Arterton for collecting these cases in *Ricci v. DeStefano*, 3:04CV1109 (JBA), 2010 WL 9113871 (D. Conn. May 12, 2010).

[5] HSF-USA, which claims to represent needy Holocaust survivors in the United States, has not objected to Mr. Ashkenazy's motion to intervene for the purpose of obtaining funds for Beit Warszawa, notwithstanding its position "that the needs of Holocaust survivors supersede all other supposed uses of Holocaust related funds." HSF-USA Reply in Opp'n to Special Masters' Submission, Ex. 1, 96-cv-4849, ECF No. 4887-1. Instead of objecting to Mr. Ashkenazy's intervention, it has joined forces with him. Ashkenazy Decl. ¶ 7, 96-cv-4849, ECF No. 4937. This lack of objection, however, is consistent with other inexplicable action that HSF-USA has taken in order to upset the distribution of funds to the neediest survivors of the Holocaust in the FSU. *See In re Holocaust Victim Assets Litig.*, Nos. 96-cv-4849 (ERK) (JO), 14-cv-890 (ERK) (JO), 2014 WL 2171144, at *5 and n.3 (E.D.N.Y. May 23, 2014).

Circuit has observed, "in making the choice between the possibility of harm to the late-arriving prospective intervenors as against the possible harm to parties who have participated diligently during the pertinent portions of this litigation, it does not strike us as unjust that intervention on the part of the late-arrivers must yield under all of the circumstances herein." *United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 596 (2d Cir. 1986).

I pause here to observe that the only exception that I have made to the overriding principle, that the Settlement Fund should be used only for the direct benefit of survivors, is the adoption of the Special Master's proposal that $10 million (later increased to $14.5 million) be appropriated principally to identify the names of the six million Jews who perished in the Holocaust. *See* Letter from Wesley A. Fisher (Mar. 22, 2013), 96-cv-4849, ECF No. 4878-3. "This is a monumental service to the Jewish people and to memory. It essentially defies the wishes of the Nazis that these people die without names and without any identity." *Swiss Fund to Hasten Fuller List of Victims* (May 1, 2013), The Jewish Week, 96-cv-4849, ECF No. 4884 (quoting Michael Berenbaum, a scholar and former deputy director of the U.S. Holocaust Memorial Museum in Washington D.C.). Indeed, this effort has won universal praise, including from Professor Thane Rosenbaum, who has otherwise supported the position of HSF-USA. *See id.*

### III. The Failure to File a Pleading

"When a party intervenes, it becomes a full participant in the lawsuit and is treated just as if it were an original party." *Schneider v. Dumbarton Developers, Inc.*, 767 F.2d 1007, 1017 (D.C. Cir. 1985)). This explains the Rule's requirement that the proposed intervenor file its own "pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P. 24(c). Thus, the law is clear that the failure to file a pleading by itself may be "fatal" to a motion to intervene. *See Abramson v. Pennwood Inv. Corp.*, 392 F.2d 759, 761 (2d Cir. 1968)

12

(affirming district court's denial of motion to intervene for failure to file a pleading); *see also Berbungs Und Commerz Union Austalt v. Collectors' Guild, Ltd.*, 782 F.Supp. 870, 874 (S.D.N.Y. 1991) ("A motion to intervene must be accompanied by a pleading . . ."); *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 595 (7th Cir. 1993) (rule is "unambiguous" in requiring the proposed intervenor to submit a pleading). The motion to intervene is accompanied only by an attorney's certification, which does not even set forth the ultimate relief Ashkenazy seeks if he were permitted to intervene.[6] Havkins Certification, 96-cv-4849, ECF No. 4907-1. This does not constitute a pleading because the only filing properly characterized as a "pleading" is a complaint or an answer. Fed. R. Civ. P. 7(a). Indeed, in his declaration dated September 27, 2013, Ashkenazy states that "[m]y only motive for seeking to intervene is to have my voice heard by the Court concerning the few but important remaining issues." Ashkenazy Decl. ¶ 20, 96-cv-4849, ECF No. 4917. This does not provide the basis for a motion to intervene. *See Tummino v. Hamburg*, 2013 WL 3005553 (E.D.N.Y. April 5, 2013). In yet another declaration filed four months later he asks for a forensic audit of the way the JDC and the Claims Conference had distributed and accounted for Looted Assets funds. Ashkenazy Decl. ¶ 7, 96-cv-4849, ECF No. 4937. If Mr. Ashkenazy had filed a complaint, the latter request could not have been made without a motion to amend that complaint.

## CONCLUSION

The motion to intervene is denied.

**SO ORDERED.**

Brooklyn, New York
May 30, 2014

/s/
Edward R. Korman
United States District Judge

---

[6] Beit Warszawa, on whose behalf Mr. Ashkenazy is apparently seeking an allocation from the Settlement Fund, has not moved to intervene. Moreover, my previous consideration of the issue of standing aside, I have never heard of an individual seeking to intervene on behalf of an entity that is perfectly capable of representing its own interests. This is the reverse of the normal situation in which an entity seeks relief on behalf of its members.