| UNITED STATES DISTRICT COURT | NOT FOR PUBLICATION |
| EASTERN DISTRICT OF NEW YORK | |

IN RE HOLOCAUST VICTIM ASSETS
LITIGATION,

**MEMORANDUM & ORDER**

-------------------------------------------------------

This Document Relates to: All Cases

14-CV-00890 (ERK) (JO)
96-CV-04849 (ERK) (JO)

KORMAN, J.:

I have received a request, dated May 21, 2014, on behalf of the Conference on Jewish Material Claims Against Germany ("Claims Conference") for approval of the budget for the vital humanitarian services to be provided in 2014 from funds allocated for the neediest victims of Nazi persecution from the Swiss Banks Settlement Fund to some of the 70,000 destitute elderly Jewish Victims of Nazi persecution living in the United, Israel, and other countries other than the former Soviet Union ("FSU"). Some background discussion is necessary to place in context this application and the objection to any allocation for the benefit of these victims.

This application involves an issue that has arisen on more than one occasion with respect to the $1.25 billion settlement of the class action against the largest Swiss banks, Credit Suisse, Union Bank of Switzerland and the Swiss Bank Corporation (the latter two of which merged during the course of litigation). The background of the case and settlement is set out in *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d. 139 (E.D.N.Y. 2000), and a discussion of some of the post-settlement issues may be found at *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89 (E.D.N.Y. 2004), which was affirmed by the Second Circuit in an opinion by Judge Cabranes that contains a complete discussion of the background and history of the case. *See In*

1

*re Holocaust Victim Assets Litig.*, 424 F.3d 132 (2d Cir. 2005), *cert. denied*, 547 U.S. 1206 (2006).

The specific issue here involves a dispute relating to the allocation of part of the proceeds of the settlement. Briefly, one of the classes benefitting from the settlement was comprised of victims of Nazi persecution from whom assets were looted by the Nazis and the plunder of which was aided by Swiss banks and other Swiss entities. Special Master Judah Gribetz recommended initially that $100 million be allocated to this Looted Assets Class and that the money be distributed to its neediest members. *See* Special Master's Proposed Plan of Allocation & Distribution of Settlement Proceeds, Vol. I at 110–42 (Sept. 11, 2000). As Judge Cabranes observed, this reflected "the Special Master's recognition that the settlement fund, while insufficient to repay even a small fraction of what was looted in the Holocaust, presented an opportunity to provide meaningful assistance to the Looted Asset Class members who are in the greatest financial need." *In re Holocaust Victim Assets Litig.*, 424 F.3d 132, 141 (2d Cir. 2005) (internal citations and quotation marks omitted). Thus, the Special Master proposed "an initial allocation of $100 million to *cy pres* programs designed to benefit the neediest elderly survivors of the Holocaust—who perhaps would be less in need today had their assets not been looted and their lives nearly destroyed. Needy Jewish survivors would receive 90% of the $100 million fund, and the remaining 10% would be distributed to needy Roma, Jehovah's Witness, disabled, and homosexual survivors." *Id.* (internal citations and quotation marks omitted).

On September 25, 2002, I adopted a supplemental recommendation of the Special Master that an additional $45 million in "excess" funds be allocated to that class. Finally, on November 17, 2003, I adopted the recommendation of the Special Master that $60 million in "excess" funds be allocated to the Looted Assets Class and be distributed in accordance with the *cy pres* principles that have successfully governed the administration of the initial allocation and

distribution of $100 million to the Looted Assets Class in 2001, and the first supplemental allocation and distribution of $45 million in 2002. This brought the total allocation to the neediest victims to $205 million.

In a letter dated March 22, 2013, Special Master Judah Gribetz and Deputy Special Master Shari Reig advised me that the accountants to the Settlement Fund had concluded that "approximately $54.5 million will remain from the $1.25 billion Settlement Fund, now that all claims processes ha[d] been completed. A total of $1.24 billion ha[d] been allocated to class members, which [could] increase to approximately $1.29 billion with the allocation of these residual funds, so that payments to Holocaust victims and heirs will have exceeded the amount of the settlement." Letter from Special Master, 96-cv-4849, ECF No. 4878. As I had previously made clear, my intention was always to distribute residual funds to the neediest Holocaust survivors as members of the Looted Assets Class. *In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89 (E.D.N.Y. 2004). Relying on more current empirical evidence similar to that which I relied upon in making the initial and subsequent allocations, *see* Elizabeth Tighe, et al., *Jewish Elderly Nazi Victims: Update* (Jan. 2013), 96-cv-4849, ECF No. 4873, I filed a draft order which proposed that the same formula for determining the asset allocation be applied to the residual funds. Thus, as previously, 90% of the $50 million in residual funds would be allocated to needy Jewish Nazi victims, of which 75% would be allocated to needy victims in the FSU. These funds would be administered on the Court's behalf by the JDC. The other 25% would be administered on the Court's behalf by the Claims Conference, of which 12.5 % would be allocated to needy victims in Israel, and the other 12.5 % to needy victims in the rest of the world. Ten percent (10%) of the $50 million in residual funds would be allocated to programs serving Roma victims of the Nazis, to be administered on the Court's behalf by the IOM.

On April 18, 2013, I granted the request of Holocaust Survivors' Foundation-USA and various named individuals (collectively "HSF-USA") for an extension until May 10, 2013, to object to the draft order. No objection was filed by that date. Consequently, on May 13, 2013, I signed the order submitted by the Special Masters. *In re Holocaust Victim Assets Litig.*, Nos. 96-CV-4849 (ERK) (MDG), 96-CV-5161, 97-CV-461, 2013 WL 2152667 (E.D.N.Y. May 13, 2013). On May 14, 2013 HSF-USA filed a letter opposing the Special Masters' recommendation. Reply in Opp., 96-cv-4849, ECF No. 4887. The opposition was untimely and I decline to consider it. Subsequently, HSF-USA filed a Rule 59 motion for rehearing on June 10, 2013, the last day for filing such a motion. Mot. to Alter J., 96-cv-4849, ECF No. 4893. The motion essentially constituted an attack on the integrity of the JDC and the Claims Conference. HSF-USA also sought a stay of any further distribution pending "a searching investigation and public hearing into their handling of previous allocations." HSF-USA Mot. for Reh'g at 13, 96-cv-4849, ECF No. 4893.

On May 23, 2014, I addressed HSF-USA's objection to the role of the JDC and denied the motion for rehearing and a stay. *In re Holocaust Victim Assets Litig.*, Nos. 14-CV-890 (ERK) (JO), 96-CV-4849 (ERK) (JO), 2014 WL 2171144 (E.D.N.Y. May 23, 2014). I address the objection to the allocation made to the neediest victims of Nazi persecution in the United States, Israel, and other countries other than the FSU that is being administered by the Claims Conference. The allocation formula, to which I have already alluded, is not an issue on this motion. Instead, the motion is an attack on the honesty and integrity of the Claims Conference. I deny the motion for a stay, and will address in an opinion to follow the motion to conduct an inquisition of the Claims Conference.

I deny the motion for a stay for two reasons. First, after reviewing the record, I have concluded that there is no justification for the inquisition HSF-USA seeks. Second, because of

4

the manner in which the Claims Conference administers the funds for the neediest victims, there is no reasonable likelihood of any impropriety, much less one that could not easily be discovered. Unlike the JDC, the Claims Conference does not directly provide assistance to needy survivors. Instead, it provides funds to agencies who serve that population. As Greg Schneider, the Executive Vice President of the Claims Conference writes in his declaration in response to HSF-USA's motion:

> We have attached a list of all Claims Conference distributions from the Swiss Banks Settlement Looted Assets Class. Each participating agency had ample opportunity, over the course of ten years, to alert the Claims Conference or complain to the Court if any of the funds in question did not reach an intended recipient. Surely, if a sum of money designated for a particular agency was not received, the agency would have made that known. There has not been one such accusation of impropriety.

Schneider Decl. ¶ 27, 96-cv-4849, ECF No. 4920-1. Not only has HSF-USA not provided evidence of a single instance of impropriety with respect to the Claims Conference administration of funds from the Looted Assets Class, but the Claims Conference's current application contains a list of every agency to which it intends to provide funds in 2014, including five in Florida, *see* Letter from Greg Schneider (May 21, 2014), 96-cv-4849, ECF No. 4961, where HSF-USA's attorneys have their practice. The latter can easily determine by inquiry to those agencies whether the funds designated for them have been received.

Moreover, Mr. Schneider's declaration continues:

> over the years, several billion dollars [other than monies from the Looted Assets Class funds] have been allocated by the Claims Conference for welfare programs which provide, among other support, homecare, emergency assistance, and medicine for the benefit of hundreds of thousands of Holocaust survivors worldwide. And no independent fraud has been found related to the social welfare funds and programs administered by the Claims Conference.

Schneider Decl. ¶ 28, 96-cv-4849, ECF No. 4920-1.

5

This is not the only reason I deny the motion for a stay. There is also a standing issue in this case. Only four percent (4%) of the monies allocated for distribution to the neediest victim outside the FSU are designated for survivors in the United States. I have previous explained the reasons for that relatively small percentage. *See In re Holocaust Victim Assets Litig.*, 302 F. Supp. 2d 89 (E.D.N.Y. 2004), *aff'd*, 424 F.3d 132 (2d Cir. 2005). Thus, of the total $2,205,000, which the Claims Conference has budgeted for 2014, $356,500 is for survivors in the United States. Letter from Greg Schneider (May 21, 2014), 96-cv-4849, ECF No. 4961. By contrast, $1,102,500 is for needy survivors in Israel. *Id.* The State of Israel has previously appeared in this action on behalf of those survivors. Nevertheless, it has voiced no objection to the Special Masters' recommendation of March 22, 2013. Nor has it objected to the Claims Conference's proposed distribution for 2014. HSF-USA has no standing to object to the Claims Conference's administration of Looted Assets funds for any country other than the United States. *See In re Holocaust Victim Assets Litig.*, Nos. 14-CV-890 (ERK) (JO), 96-CV-4849 (ERK) (JO), 2014 WL 2171144, at *4-5 (E.D.N.Y. May 23, 2014) (discussing the lack of standing of HSF-USA to object to the administration of funds for the neediest victims in the FSU by the JDC).

Moreover, for the reasons to which I have already alluded, even though HSF–USA has standing to object to the administration of Looted Assets funds in the United States by the Claims Conference, it has not made a showing sufficient to justify a stay, even for the expenditure of $356,500. The Supreme Court has held that "[a] stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and [t]he propriety of its issue is dependent upon the circumstances of the particular case. . . . The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 434-35 (2009) (internal citations and quotation

marks omitted). HSF-USA has not met its burden of showing that the circumstances justify and exercise of that discretion.

---

While I have not specifically addressed the merits of the attack on the Claims Conference, I call attention to a letter of Stuart Eizenstat. Mr Eizenstat has served in various positions in the administration of Presidents Carter and Clinton. These positions include chief White House domestic policy adviser, U.S. Ambassador to the European Union, Under Secretary of Commerce for International Trade, Under Secretary of State for Economic, Business and Agricultural Affairs, and Deputy Secretary of the Treasury in the Clinton Administration. Mr. Eizenstat led the team from the Claims Conference that negotiated an agreement with the Federal Republic of Germany that provides for "approximately $1 billion over the four year period, 2014-2017, for homecare for Jewish Nazi victims, with the annual amount increasing every year through 2017." Eizenstat Letter (May 28, 2013), 96-cv-4849, ECF No. 4920-3.

In his letter to the Chairman of the Board of the Claims Conference, Mr. Eizenstat goes on to express his gratitude to Greg Schneider, the Executive Vice President of the Claims Conference, for his contribution to that agreement:

> I wanted to personally let you know of my gratitude to Greg Schneider for having the vision and drive to organize this campaign, which has culminated in this agreement. Greg has it a priority to gather detailed information and data on the growing plight of aging Nazi victims and present it to the German government in an effective and compelling fashion in order to demonstrate their increasing needs to the German government. His dedication and professionalism are above and beyond what could be expected, and he made it clear throughout this process that he was absolutely committed to obtaining the funding to which the Finance Ministry ultimately agreed. Greg's passion and integrity are well appreciated by out German government interlocutors. The lives of tens of thousands of Holocaust victims will be made easier in their old age due to Greg's skill and vision.

*Id.*

The needy Holocaust survivors have benefitted from the extraordinary efforts of Mr. Schneider and the Claims Conference. They deserve praise, rather than scorn, for their work.

## CONCLUSION

The motion for rehearing and a stay is denied. I intend to file supplemental opinion with respect to the motion for rehearing. I decline to delay, however, the distribution of funds to the neediest victims of the Holocaust outside of the FSU.

**SO ORDERED.**

Brooklyn, New York
May 30, 2014 /s/
Edward R. Korman
Senior United States District Judge